Martin MAIDENBAUM and Joseph
A. Fiore, Plaintiffs,

v.

BALLY'S PARK PLACE,
INC., Defendant.

Civ. No. 93–1475 (JEI), 93–1620 (SSB).

United States District Court,
D. New Jersey.

Dec. 28, 1994.

Louis P. McFadden, Jr., P.C. by Louis P. McFadden, Cape May Court House, NJ, for plaintiffs.

Grotta, Glassman & Hoffman, P.A. by Margaret M. Madden, Francine Esposito, Roseland, NJ, for defendant.

## OPINION

IRENAS, District Judge:

### I. INTRODUCTION

In March of 1992 Bally's Park Place, Inc. ("Bally's") discharged sixteen floorpeople, including the plaintiffs, as part of a larger reduction in force. The plaintiffs, Martin Maidenbaum and Joseph A. Fiore, both of whom were then age fifty-three, claim age discrimination under both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. § 10:5–1 *et seq.* (Supp.1994).[1] The complaint also alleges wrongful discharge in breach of an implied contract of employment under New Jersey law. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' state law breach of contract action is cognizable under the Court's supplemental jurisdiction. 28 U.S.C. § 1367(a).

Presently before the Court is (1) a motion for summary judgment by defendant and (2)

---

**1.** Separate actions filed by each plaintiff were consolidated for discovery by Court order dated June 30, 1993, and for all purposes on February 17, 1994.

a cross-motion for partial summary judgment to establish the plaintiffs' prima facie age discrimination case. Because we find insufficient evidence of discrimination to create a triable issue of fact, the defendant's motion for summary judgment on the ADEA and LAD claims is granted, and plaintiffs' cross-motion is denied. We decline to exercise supplemental jurisdiction over the remaining state law wrongful discharge claim, which is dismissed without prejudice.

## II. BACKGROUND

Casino games are organized in areas known as pits. Pit employees include pit bosses, floorpeople, dual-rate dealers and dealers. Pit bosses oversee several floorpeople. Floorpeople supervise several tables at which the same game is being played. Dual-rate dealers may either deal or serve as floorpeople.

All casino employees are required to be licensed by the Casino Control Commission ("CCC"). N.J.S.A. 5:12–90(a); N.J.A.C. 19:41–1.3. An employee's license must also be endorsed by the CCC to show the particular positions which the employee is qualified to hold. N.J.S.A. 5:12–90(d); N.J.A.C. 19:41–1.3(a), (b). Although the CCC had always established and applied specific qualifications for a license endorsement authorizing employment in different positions such as dealer, boxperson, croupier, floorperson, etc., these qualifications were not made part of the New Jersey Administrative Code until September 6, 1994. N.J.A.C. 19:41–1.6 *et seq.* The requirements for a floorperson endorsement are now set forth in N.J.A.C. 19:41–1.9(c). An already licensed floorperson

who desires to supervise more than one game must meet additional requirements.[2]

Joseph Fiore was forty years old when he was hired by Bally's as a craps dealer on December 17, 1979. On June 30, 1980, Bally's hired forty-one year old Martin Maidenbaum for the same position. Both were promoted to floorperson in the year following their respective dates of hire, and both were among sixteen floorpeople, ten of whom were over forty, terminated by Bally's on March 10, 1992. Neither plaintiff was ever licensed to supervise a game other than craps.

Sometime prior to March of 1992, Bally's decided to reduce its management staff by about forty employees.[3] In determining which floorpeople to terminate, Bally's excluded those who were already qualified to supervise two games or who had a minimum of twenty-five[4] hours experience in dealing a second game. Bally's then laid off sixteen[5] of the remaining employees with the least seniority. Neither plaintiff had acquired any hours dealing a second game.

Until four days prior to the layoffs Bally's had a written termination policy based solely on seniority. However, in a November, 1990, meeting Vice President of Casino Operations, James Carr, stated that seniority would not be the only factor considered in any future layoff and that such determinations would be based on whether floorpeople were qualified to supervise a second game. Richard Knight, Vice President of Casino Operations, advised game supervisors in January, 1992, that it would be "strongly recommended" for floorpeople to "get a second game." (Knight Dep. at 91.)

**2.** One way to qualify for a floorperson license endorsement to supervise a second game is to amass 350 hours experience in dealing that game. N.J.A.C. 19:41–1.9(c)(3)(i)(2).

**3.** There are twenty-five names listed as terminated employees in defendant's response to plaintiffs' first set of interrogatories in addition to the sixteen floorpeople, thus making a total of forty-one layoffs. Eleven of these twenty-five employees were at least forty years old, and three were over fifty. (Madden Cert., Ex. G, dated Aug. 5, 1994.) The record does not reflect their job descriptions or the age distribution of employees with similar job classifications.

**4.** Bally's claims the number of hours needed to avoid layoff was twenty-five while plaintiffs claim they were told at the time of layoff that the criterion was forty hours. In fact, Bally's applied the twenty-five hour criterion which resulted in the retention of one employee who would have been terminated if the forty hour criterion had been applied.

**5.** Bally's claims that two of the sixteen floorpeople laid off actually quit voluntarily. For purposes of this motion we accept plaintiffs' number. One employee, Richard Decker, would have been terminated even if he had not resigned. However, the other, Dennis Daly, had sufficient seniority to avoid the layoff.

Plaintiffs allege that use of the second game rationale to modify an existing seniority-based layoff system constituted illegal age discrimination on theories of both disparate impact and disparate treatment. Defendant argues that neither the layoffs nor the criteria selected to implement the terminations were motivated by anything but the need to reduce expenses and enhance the flexibility of its remaining management staff.

### III. SUMMARY JUDGMENT STANDARD

Defendant moved for summary judgment on October 7, 1994. Under Fed.R.Civ.P. Rule 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The nonmoving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

### IV. AGE DISCRIMINATION CLAIMS

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similar provisions are contained in the New Jersey LAD. N.J.S.A. 10:5–12(a). Age discrimination claims under the LAD are governed by the same standards and burden of proof structures applicable under the ADEA. *E.g., McKenna v. Pacific Rail Service*, 32 F.3d 820 (3d Cir.1994); *Giammario v. Trenton Bd. of Educ.*, 203 N.J.Super. 356, 497 A.2d 199 (App.Div.), *certif. denied*, 102 N.J. 336, 508 A.2d 212 (1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986).

Plaintiffs' age discrimination claims are based on the theories of disparate impact and disparate treatment. In attempting to prove disparate treatment plaintiffs argue, alternatively, that the case is one based on mixed motives, direct evidence, or pretext.

### A. *DISPARATE IMPACT*

In *Griggs v. Duke Power Co.*, the Supreme Court held that a showing of disparate impact, as opposed to discriminatory motive, was sufficient to establish unlawful discrimination in cases involving charges of racial discrimination. 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However, neither the Supreme Court nor the Third Circuit has directly held that the disparate impact theory applies to age discrimination suits.

While a concurring opinion of the Supreme Court in *Hazen Paper Co. v. Biggins*, — U.S. ——, ——, 113 S.Ct. 1701, 1710, 123 L.Ed.2d 338 (1993),[6] has cast doubt on the

---

**6.** *Justice Kennedy noted*
As the Court acknowledges, *ante*, at 1257, we

have not yet addressed the question whether such a claim is cognizable under the ADEA,

applicability of disparate impact analysis to ADEA claims, circuit courts of appeal, district courts in the Third Circuit and the New Jersey Appellate Division have held that such analysis is appropriate in age discrimination cases. *See Cherchi v. Mobil Oil Corp.*, 693 F.Supp. 156, 165 (D.N.J.1988), *aff'd without op.*, 865 F.2d 249 (3d Cir.1988) (citing circuit court and district court cases applying disparate impact analysis to age discrimination cases); *Giammario, supra* (New Jersey Appellate Division affirmed trial court's decision to apply impact analysis to age discrimination case). Therefore, we shall examine plaintiffs' disparate impact claims.

"To establish a prima facie case under the disparate impact model, plaintiff[s] must show 'that the facially neutral employment practice had a significantly discriminatory impact.'" *Massarsky v. General Motors Corp.*, 706 F.2d 111, 120 (3d Cir.1983) (*quoting Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982)), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *see also* 42 U.S.C. § 2000e–2(k)(1)(A)(i) (Civil Rights Act of 1991). Once this showing is made, the employer may defend by demonstrating that the employment practice is required by business necessity. 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Massarsky*, 706 F.2d at 120; *Newark Branch, N.A.A.C.P. v. Town of Harrison, New Jersey*, 940 F.2d 792, 798 (3d Cir.1991).

Under the Civil Rights Act of 1991 the burden of persuading the trier of fact that employment practices are justified by business necessity falls on the employer. 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1525 n. 34 (5th Cir.1993). However, the employer's burden does not arise unless the plaintiff is able to establish her prima facie case. 42 U.S.C. § 2000e–2(k)(1)(B)(ii); *Massarsky*, 706 F.2d at 120.

▆▆▆ To establish a prima facie case, plaintiffs must show that the questioned employment practice had a disparate impact on the protected class of employees age forty or older. *Massarsky*, 706 F.2d at 120. Plaintiffs claim that defendant's termination criteria—selecting one-game supervisors without twenty-five hours towards a second game—had the requisite discriminatory impact. To prove discriminatory impact, plaintiffs frequently use "statistics from which it may be inferred that the employer's employment practice significantly disadvantaged employees [in the protected class]." *Cherchi*, 693 F.Supp. at 166. Plaintiffs' statistics show that if Bally's had followed its former layoff policy based solely on seniority, only 25% of those terminated (four out of sixteen employees) would have been in the protected class, rather than 63% (ten out of sixteen employees).

The Court finds this evidence unconvincing. First, the sample size of sixteen terminated employees is insufficient to find disparate impact. Courts have consistently found similar sample sizes as too small to be meaningful. *See, e.g., Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977) ("Considerations of such a small sample size may, of course, detract from the value of [statistical] evidence"); *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (approving of district court's concern for smallness of sample size of thirteen); *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 943 n. 7 (6th Cir.1987) ("small statistical samples provide little or no probative force to show discrimination"); *Krystof v. Hyatt Corp.*, 827 F.Supp. 490, 493 (N.D.Ill.1993) (citing numerous cases rejecting statistical conclusions based on small samples). The Third Circuit has held that "[a]n adverse impact on a single employee, or even a few employees, is not sufficient to establish disparate impact." *Massarsky*, 706 F.2d at 121.

The lack of probative value from such a small sample size is evident when one examines the ages of the entire staff of floorpeople at Bally's, rather than just the terminated employees. Bally's employed 221 floorpeople

and there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA. *Id.*

before the reduction in force of whom ninety-four, over 40%, were forty or older. (Defendant's Reply Br. Attach. A.) Moreover, eleven of the ninety-four were in the oldest age group (fifty-five to sixty-six).[7]

The reduction in force barely affected the age distribution among the remaining floorpeople. Employees in the thirty-five to thirty-nine age group increased by 2%, while those in the fifty to fifty-four age group decreased by 1%. In all other age groups the percentage of the total number of floorpeople remained the same before and after layoffs. Bally's retained most age-protected floorpeople, including all eleven floorpeople age fifty-five to sixty-six.

Of sixteen floorpeople discharged, five were between thirty-one and thirty-four years old, one was between thirty-five and thirty-nine, four were between forty and forty-four, four were between forty-five and forty-nine, and two, the plaintiffs, were fifty-three. This age distribution, when compared to the age distribution of the more than 200 floorpeople remaining, is not evidence of disparate impact. It is difficult, on any basis, to impute discriminatory intent to the decision to limit layoffs to one-game floorpeople. If we consider, as we probably should, that the only suspect criteria for avoiding layoff was twenty-five hours of dealing a second game,[8] the evidence is even less persuasive. Saving from termination those with twenty-five hours of dealing a second game actually preserved the jobs of only three younger employees.[9]

Since plaintiffs fail to establish a prima facie showing that defendant's layoff criteria had a disproportionate impact on protected employees, defendant's motion for summary judgment on plaintiffs' disparate impact claim is granted.

7. Plaintiffs have produced a list showing only 209 floorpeople. However, that list also includes ninety-four employees over the age of 40.

8. See discussion at page 1266, *infra.*

9. Annexed to this opinion as Schedule 1 are the names and ages on March 10, 1992, of the sixteen floorpeople who would have been laid off if seniority were applied to a list of all floorpeople; the names and ages of those who would have been laid off if seniority were applied to a list of

## B.  DISPARATE TREATMENT

### 1.  MIXED MOTIVES

To establish a mixed motives case, plaintiffs must demonstrate that discrimination was a motivating factor in an employment decision. 42 U.S.C. § 2000e–2(m); *see Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).[10] Justice O'Connor called the evidence required to establish a mixed motives case "direct evidence": "What is required is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring).

In fleshing out the meaning of "direct evidence," the Third Circuit, in *Hook v. Ernst & Young,* 28 F.3d 366, 373–74 (3d Cir.1994), examined the Second Circuit's decision in *Ostrowski v. Atlantic Mut. Ins. Companies,* 968 F.2d 171 (2d Cir.1992) (an ADEA case). *Ostrowski* observed that because the decisionmaker is unlikely to directly admit a discriminatory motive in discharging an employee, circumstantial evidence may sometimes establish a mixed motives case, but only where the circumstantial evidence is "tied directly to the alleged discriminatory animus." *Id.* at 182.

Evidence justifying a mixed motives instruction includes "policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit." *Id.* *Ostrowski* also approved of two earlier decisions in which the trial court had given a mixed motives instruction. *See  Grant  v.  Strip–Casting*

all one-game floorpeople; and the names and ages of those actually laid off. Dennis Daly had sufficient seniority to avoid lay off, but for purposes of this opinion we have included his name even though the record seems clear that he resigned voluntarily. See *supra* note 5.

10. The Third Circuit has applied case law from mixed motives cases pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* to ADEA cases. *Armbruster,* 32 F.3d at 777 & n. 10.

*Corp.*, 880 F.2d 1564, 1568 (2d Cir.1989) (president of company stated that he wanted a younger person in the plaintiff's position); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1179 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992) (company had an approved category of employees it called the " 'Young Tiger' classification" and company appraisals specifically referred to " 'youth' in a positive manner") (*cited in Ostrowski*, 968 F.2d at 181–82).

*Ostrowski* also gave several examples of evidence that would not support a mixed motives instruction, including: (1) "purely statistical" evidence; (2) "evidence merely of the plaintiff's qualification for and the availability of a given position;" and (3) " 'stray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process." 968 F.2d at 182.

Following *Ostrowski* the Third Circuit found that evidence "must directly reflect a discriminatory or retaliatory animus on the part of a person involved in the decisionmaking process" to establish a mixed motives case. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994) (citations omitted).[11] "In a mixed-motives case the defendant condemns himself of invidious discrimination out of his own mouth or by his own overtly biased acts." *Hook*, 28 F.3d at 374 n. 3.

Plaintiffs posit as direct evidence: (1) a memo with the names of one-game supervisors in order of seniority and with the employees' ages noted (Plaintiffs' Ex. 7) and (2) the revocation of Bally's seniority-based termination policy only four days before the layoffs.

■ Bally's asserts the memo was generated to determine whether the impending layoff would disproportionately impact a protected class. Bally's also claims that the person who actually made the layoff decisions (Richard Knight) never saw this memo, which was requested by Bally's general counsel (Dennis Venuti) and prepared by the Director of Labor Relations (Richard Tartaglio). There is undisputed deposition testimony that Knight requested and received a list of one-game supervisors by seniority and their hours towards a second game, if any. Whether Knight actually saw the memo that also had the ages of these employees is unclear, but resolution of this fact is unnecessary for purposes of summary judgment.

Even if Richard Knight used the memo, this conduct is not evidence of discriminatory animus. The Third Circuit has held that an employer's preparation of documents which evaluate employees' ages is not per se direct evidence of discrimination unless plaintiffs can show the age notations evidence an intent to discriminate. *Armbruster*, 32 F.3d at 775, 781 (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990); *E.E.O.C. v. MCI Int'l, Inc.*, 829 F.Supp. 1438, 1477 (D.N.J.1993)).

Bally's list contains detailed statistics of not only the ages of one-game floorpeople considered for termination but also employees' gender and race.[12] An employer's knowledge of the protected characteristics of its work force is equally consistent with an intent to comply with the laws against discrimination as it is with the contrary inference. The mere appearance of age, sex or gender information on Bally's list is insufficient to render it evidence of discrimination.[13]

■ Plaintiffs argue that Bally's retraction of its seniority-based termination policy is also direct evidence of discrimination. Not only is it rational, as well as facially neutral, to retain floorpeople who actually or potentially were able to supervise more than one game, but there is also no evidence in the record which supports an inference that age considerations motivated that decision.

---

11. Unlike the case *sub judice*, *Armbruster* and *Ostrowski* were unaffected by the Civil Rights Act of 1991. However, that Act did not change the "direct evidence" requirement necessary to support a mixed motives case. *See* H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 45, *reprinted in* 1991 U.S.C.C.A.N. 549, 586 (legislative history of Act).

12. This document also contains information regarding floorpeople's seniority and a list of those floorpeople who had less than twenty-five hours in a second game.

13. In *Armbruster*, the court cautioned that it would create a "perverse effect" to have a business's attempt to *prevent* discrimination be used to *prove* discrimination. 32 F.3d at 775.

Plaintiffs argue that the policy revocation disproportionately impacted older floorpeople. We discounted this argument in our examination of plaintiffs' disparate impact case, *supra*, and, as noted earlier, statistical evidence is not direct evidence of discrimination. *Hook*, 28 F.3d at 374 (*quoting Ostrowski*, 968 F.2d at 182).

■■■ Defendant's termination criteria were not inextricably linked to age. Seniority and age are not equivalent. *Hazen Paper Co. v. Biggins*, —— U.S. ——, ——, 113 S.Ct. 1701, 1707, 123 L.Ed.2d 338 (1993); *see also MCI Int'l, Inc.*, 829 F.Supp. at 1473. A twenty-year-old employee would have more seniority than an individual in the protected class hired one day later. Indeed, a company which had only recently recognized its obligations to hire older workers would adversely impact those workers if a seniority-based termination policy were used exclusively to determine layoffs. An employer's use of a seniority-based termination policy may not shield it from claims of age discrimination. For the same reason, the failure to base layoffs on seniority is not per se discriminatory.

Since plaintiffs offer no direct evidence of age discrimination, this court will not employ the burden-shifting analysis appropriate in a mixed motives case to the instant case.

### 2. DIRECT EVIDENCE

■■■ Plaintiffs may prove discriminatory disparate treatment with either direct or circumstantial evidence. *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.1987) (an ADEA case), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). "When direct evidence is available, problems of proof are no different than in other civil cases." *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 130 (3d Cir.1985), *aff'd*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Chipollini*, 814 F.2d at 897. Thus, if an employee shows by direct evidence that there

is a genuine issue of fact as to whether age was a determinative factor in her discharge, summary judgment is inappropriate. *MCI Int'l, Inc.*, 829 F.Supp. at 1446; *Miller v. State Chemical Mfg. Co.*, 706 F.Supp. 1166, 1170–71 (W.D.Pa.1988).

■■■ We have already evaluated the meaning of direct evidence in a mixed motives framework. Plaintiffs proffer the same two examples for their direct evidence case as for their mixed motives case (the listing of employees showing their ages and the revocation of the seniority-based termination policy). The Court has already determined that there was insufficient evidence to support a mixed motives case (where employment decisions are based on *both* legitimate and discriminatory considerations). Evidence that is inadequate to support a mixed motives claim is equally inadequate to support a direct evidence disparate treatment claim. Because plaintiffs have failed to point to direct evidence of age discrimination, the Court must consider the circumstantial evidence.

### 3. PRETEXT

■■■ In *McDonnell Douglas Corp. v. Green*,[14] the Supreme Court set forth a detailed method for establishing an inference of discrimination in the absence of direct evidence. 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1983). *McDonnell Douglas* implemented a three-step analysis that allocates the burden of production as follows: (1) plaintiff must come forth with sufficient evidence to establish a prima facie case of discrimination; (2) if plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant, who must articulate some legitimate, non-discriminatory reason for the employee's discharge; (3) if defendant is able to meet this burden, plaintiff must be given the opportunity to come forth with sufficient evidence to show that the legitimate reasons offered by the defendant should not be believed *and* that the protected characteristic was "the real reason" for the adverse employment action.

14. The burden-shifting analysis of *McDonnell Douglas*, a Title VII case, and its progeny applies to the ADEA. *See Armbruster*, 32 F.3d at 777 n. 10, 782; *Seman v. Coplay Cement Co.*, 26 F.3d 428, 432 n. 7 (3d Cir.1994).

*St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

### (a) *The Prima Facie Case*

■ To establish a prima facie case of disparate treatment in a reduction in force context, plaintiffs must prove by a preponderance of the evidence that the plaintiffs (1) were at least forty years of age when terminated, (2) were qualified and (3) unprotected workers were retained or otherwise treated more favorably. *Massarsky,* 706 F.2d at 118; *Seman,* 26 F.3d at 431; *Armbruster,* 32 F.3d at 777. The plaintiffs must also be "similarly situated in terms of qualifications and position" to the younger employees retained. *MCI Int'l, Inc.,* 829 F.Supp. at 1452 (*citing Hill v. Bethlehem Steel Corp.,* 729 F.Supp. 1071, 1075 n. 6, *aff'd without op.,* 902 F.2d 1560 (3d Cir.1990)).

■ There is no dispute that plaintiffs were members of the protected class and were qualified for their positions. Bally's does contend, however, that plaintiffs are not similarly situated to the employees excluded from possible termination. Unlike all of the excluded employees, neither plaintiff was licensed to supervise a second game or had accumulated any hours dealing in a second game.[15]

The Court finds that the plaintiffs in this case are not similarly situated to those floorpeople who were licensed to supervise more than one game or who had begun the process of qualifying by dealing at least twenty-five hours in a second game. With respect to those employees whose licenses already bore a floorperson endorsement for a second game, the difference is obvious and indisputable.

With respect to those who had only started the qualification process by accumulating time dealing a second game, the difference is also significant, particularly when considering that the floorpeople had been warned by management at least two months earlier of the advisability of being qualified in more than one game. An employee who responds affirmatively to an expressed management need does not stand in the same shoes as one who shows no interest in expanding his job capabilities. And, as noted earlier, the addition of the twenty-five hour requirement ultimately increased by only three the number of terminated employees in the protected class.[16] Thus, summary judgment could be granted to the defendant solely on the basis that plaintiffs failed to establish a prima facie case.

### (b) *Non–Discriminatory Reason for Termination*

■ Even if the Court were to assume, *arguendo,* that plaintiffs have established their prima facie case, we would still find that they are unable to meet their ultimate burden of showing Bally's non-discriminatory reason for termination was a pretext for age discrimination.

■ The next prong of the *McDonnell Douglas* analysis shifts the burden of production to the defendant to articulate a legitimate, non-discriminatory reason for the employees' discharge. If the defendant fails

---

**15.** While Fiore was licensed by the Casino Control Commission to deal five casino games, he had no hours dealing towards a second game nor was he scheduled to deal any hours in a second game. *See* N.J.A.C. 19:41–1.9(c)(3)(i), (ii).

**16.** See page 1260, *supra.* In support of their prima facie case, plaintiffs argue that defendant treated two younger employees in a manner inconsistent with the stated termination policy. A thirty-five year old floorperson, Ronald Ocello, had only sixteen hours toward a second game at the time of the layoffs but was still retained. However, he already had been scheduled to deal an additional nine or more hours. Another floorperson, Deborah Cella, age thirty-six, was not laid off although it now appears that she may not in fact have dealt twenty-five hours in a second game. However, forty hours of dealing were reflected in Bally's records when the layoffs were made, and there is no evidence offered which tends to prove that defendant knew the records to be inaccurate at the time of layoffs. Even if one were to surmise that the layoff criteria were unevenly applied for the express purpose of protecting these two employees, there is simply no proof that this action might have been motivated by the plaintiffs' ages or the ages of any other Bally's floorpeople.

to produce evidence which, if taken as true, would permit the conclusion that there was a non-discriminatory reason for the defendant's action, judgment must be entered on behalf of the plaintiff. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2747; *see also Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993); *Chipollini,* 814 F.2d at 898. However, the defendant's burden is not one of persuasion but only of production of evidence logically supporting a reason for the dismissal. *Burdine,* 450 U.S. at 257–58, 101 S.Ct. at 1095–96; *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175, 179 (3d Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986).

Defendant claims that business conditions in 1992 led it to reduce management staff. Sixteen of the forty-one terminated employees were one-game floorpeople who had not dealt a minimum number of hours in a second game. Both cutting corporate expenses and increasing the assignment flexibility of its remaining supervisory staff are certainly non-discriminatory reasons for the March 10, 1992, layoffs. We therefore find that the defendant has met its burden of production.

### (c) *Proffered Explanation As Pretext for Age Discrimination*

The Supreme Court's decision in *St. Mary's* clarified step three in the *McDonnell Douglas* framework. Previously, the plaintiff could meet the burden of proof merely by establishing that the non-discriminatory reason proffered by the defendant was not credible. *See Ezold,* 983 F.2d at 522; *Bennun v. Rutgers State University,* 941 F.2d 154, 170 (3d Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). Under *St. Mary's* the plaintiff must prove by a preponderance of evidence *both* that the reason was false and that discrimination was the real reason. —— U.S. at ——, 113 S.Ct. at 2752.

In *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir.1994), the Third Circuit decided the proper standard for summary judgment since the teachings of *St. Mary's.* Where plaintiff establishes a prima facie case and the defendant proffers a legitimate non-discriminatory reason for the employment decision, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.[17] *Fuentes,* 32 F.3d at 764 (citations omitted).

In addressing the quantum of evidence necessary to avoid summary judgment, the Third Circuit stated that the plaintiff's evidence "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]" *Id.* (internal citations omitted) (emphasis in original). Furthermore, the question is not whether the employer's action was wise or prudent. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'[.]" *Id.* at 765 (*quoting Ezold,* 983 F.2d at 531).

On August 11, 1992, Bally's promoted fifteen dealers to dual-rate dealers, 80% of whom were under age forty. Plaintiffs acknowledge that dual-rate dealers are licensed to both deal and supervise at least two games. Nevertheless, plaintiffs argue that the supervisory capacity of a dual-rate dealer is the same as that of a floorperson, and thus the younger promoted employees should be

---

**17.** Because the Third Circuit has settled the standard for summary judgment in a pretext case, the Court need not be concerned with the pending Third Circuit decision regarding the plaintiff's ultimate burden of proof in a pretext case. *Compare Miller v. CIGNA Corp.,* No. 93–1773, 1994 WL 283269, 1994 U.S.App. LEXIS 16158 (3d Cir. June 28, 1994) (requiring that discrimination be *a* determinative factor in the employment decision), *vacated, reh'g en banc granted,* No. 93–1773, 1994 WL 420284, 1994 U.S.App. LEXIS 21371 (3d Cir. Aug. 12, 1994) *with Seman,* 26 F.3d at 437 (requiring that discrimination be *the* determining factor).

considered as replacements for the floorpeople terminated in March, 1992.

Bally's responds that "dual-rate dealers were paid less than floorpeople, did not increase Bally's total number of employees, and unlike plaintiffs, provided the flexibility that Bally's required." (Defendant's Reply Br. at 11.) These post-layoff promotions of employees who were able to deal or supervise in two or more games is totally consistent with Bally's stated desire to increase the flexibility of its supervisory staff without increasing the total number of employees.

Plaintiffs challenge the business necessity for the layoffs by arguing that (1) Bally's had a high volume of customers at the time of layoffs, (2) the number of pits opened at Bally's in 1991 were also open in 1992 and (3) the same number of supervisors worked the pits at Bally's before and after the layoffs. Further, plaintiffs claim that Bally's anticipated the approval of twenty-four hour gambling and additional casino games. Plaintiffs also refer to a July, 1992, memo advising employees not to take extra time off because of understaffing.

Apart from the limited evidential value of a memo prepared almost four months after the layoffs, to the extent that it manifests a management desire to make more intensive use of a smaller supervisor staff, it is consistent with the business purposes underlying the March, 1992, layoffs. We note that plaintiffs have produced a portion of the 1992 annual report of Bally's parent company which clearly shows that it was undergoing major restructuring in 1992 in order to service existing debt. (Plaintiffs' Ex. 1.)

The wisdom or prudence of Bally's action is not at issue. Rather, "the non-moving plaintiff must demonstrate ... weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" in order to show discriminatory animus. *Fuentes*, 32 F.3d at 765. Plaintiffs have presented no proof that Bally's decision was even implausible under the business conditions that existed at the

time of layoffs, let alone motivated by age discrimination.

There are likely to be very few business judgments the wisdom of which cannot, with hindsight, be challenged. As noted in a recent decision:

> It is difficult to imagine any case in which the plaintiff could not create a genuine factual dispute about whether his performance was satisfactory. That is, almost any litigant could argue that the proffered reasons for his termination were factually incorrect or incomplete. To allow a motion for summary judgment to be defeated simply because there was a dispute concerning the factual premises underlying the employer's termination decision would obviate the *McDonnell Douglas/Burdine/St. Mary's* framework.

*Waldron v. SL Industries, Inc.*, 849 F.Supp. 996, 1006 (D.N.J.1994). The business rationale for the layoffs demonstrates neither the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" from which a reasonable fact finder could infer an age-based animus. *Fuentes*, 32 F.3d at 765.

Bally's Director of Labor Relations prepared a memo listing not only the employees' ages, but also other protected classifications such as race and gender. This document is no more evidence of age discrimination than it is evidence of sex or race discrimination. We earlier held [18] that this memo was not direct evidence of discriminatory animus. We now hold that this same evidence does not support a claim of pretext.

Plaintiffs also assert proof of aged-based animus in the manner in which Bally's implemented the new layoff policy, including (1) revocation of the seniority-based termination policy only four days before layoffs, (2) disavowal of the existence of the old policy by management, (3) failure to warn employees in writing of a change in job criteria in violation of Bally's progressive discipline policy, (4) failure to *require* dual-game capacity, (5) failure to consider the performance of individuals, and (6) failure to demote or allow part-time work is evidence of pretext.[19]

---

**18.** See, *supra,* part IV.B.1.

**19.** Additionally, plaintiffs ask us to consider the disparate impact the dealing hours criteria had on protected workers. We rejected the meaning-

We have already found that Bally's retraction of its seniority-based termination policy is not direct evidence of discrimination. Moreover, plaintiff has produced no evidence that the person who actually made the layoff decisions, Richard Knight, was aware of the revoked policy. But even if Knight were aware of that policy and chose to ignore it, that is not evidence of discriminatory intent. As discussed above,[20] age and years of service are analytically distinct, and the failure to conduct a reduction in force based solely on seniority is not circumstantial evidence of age discrimination. *See Hazen,* —— U.S. at ——, 113 S.Ct. at 1707.

Antidiscrimination laws do not require employers to inform employees of the need for improving their job skills. *MCI Int'l. Inc.,* 829 F.Supp. at 1453. Plaintiffs admit that they were told, at the very least, that getting a second game would be beneficial. This suggestion was more than the law requires.

Neither Bally's failure to *require* dual-game capacity for all floorpeople, nor its failure to base its layoff decisions on individual performance (beyond hours dealt in a second game), nor defendant's failure to demote or allow part-time work [21] reflects discriminatory animus. Undoubtedly Bally's had a wide range of options available when deciding to reduce costs. That it chose some of those options and not others provides no basis, in and of itself, to believe that age discrimination motivated the path taken.

Plaintiffs argue that there was no factual justification for the criteria used to designate floorpeople subject to layoff, particularly the exclusion of those who had dealt twenty-five hours or more in a second game. Dr. James

Fadigan, an Equal Employment Opportunity consultant retained by plaintiffs, asserts that the twenty-five hour requirement was not rationally related to either job function or performance or to Bally's articulated goal of a more flexible supervisory staff. Although not argued by plaintiffs, we also note that twenty-five hours is only a small part of the 350 or more hours of dealing which would be required for a floorperson to obtain a second game license endorsement. N.J.A.C. 19:41–1.9(c)(3)(i)(2).

Bally's asserts that the twenty-five hour dealing requirement was reliable evidence of a floorperson's good faith efforts to acquire dual game capacity. Whether this was or was not a wise business judgment is not for the Court to say. It is not, however, implausible, incoherent, inconsistent or contradictory and does not support an inference of age discrimination. *Fuentes,* 32 F.3d at 765.

As already noted, a statistical analysis of the layoffs compels the same conclusion. If Bally's had terminated sixteen one-game floorpeople *without* the additional dealing hours requirement—based only on seniority—only three floorpeople in the protected class would have been spared termination. Maidenbaum himself would have been discharged if the layoffs of one-game floorpeople had been based on seniority alone. Even if the Court could be persuaded that this twenty-five hour requirement was instituted to save two or three particular floorpeople, we do not believe there is any evidence that this policy was devised based on the ages of the people saved from termination or those who were laid off.[22]

---

fulness of these statistics in our disparate impact discussion, see *supra* part IV.A, and we are equally unimpressed with their usefulness in this pretext analysis.

**20.** See *supra* part IV.B.1.

**21.** When asked why he did not consider demotions instead of layoffs, Richard Knight, the Vice President of Casino Operations in charge of the March 1992 layoffs, stated:
> It's been my experience that demotions just create a disgruntled employee and create nothing but problems . . . I generally do not do that as a manager.

(Knight Dep. at 144.) When asked about placing supervisors on part-time status rather than discharging them, Knight said that Bally's did not employ part-time supervisors in March 1992. (Knight Dep. at 145.)

**22.** Plaintiffs argue that many employees retained after the reduction in force in March of 1992 never obtained the capacity to deal a second game until 1993 or 1994. However, only three employees were saved from termination by the twenty-five hour dealing requirement. Plaintiffs' argument disregards Bally's *need to reduce staff* as well as to maintain flexibility.

Maidenbaum alleges that after his termination Bally's presented him with a release of his rights "under applicable federal and state laws relating to employment discrimination." (Plaintiffs' Ex. 14.) Plaintiff argues that this form of release violates the provisions of 29 U.S.C. § 626(f) which was added to the ADEA as part of the Older Workers Benefit Protection Act, Pub.L. No. 101–433, 104 Stat. 978 (1990) (codified at 29 U.S.C. §§ 621, 621 notes, 623, 623 notes, 626, 626 note, 630), as amended Pub.L. No. 102–236, § 9, 105 Stat. 1816 (1991) (codified at 29 U.S.C. § 623 note).

Section 626(f) provides that a worker may not waive his ADEA rights unless the waiver makes specific reference to those rights, the employee is given at least twenty-one days to consider the release, and the employee is advised in writing to consult an attorney. Maidenbaum never signed the release, which was marked "DRAFT", and defendant has never asserted that plaintiffs ever surrendered their ADEA rights. We have no way of guessing whether Bally's would have made the required disclosures or waited an appropriate period before accepting the signed release. Suffice it to say that there is no logical connection in this case between the draft release and an intent to violate the laws against age discrimination.[23]

Plaintiffs' meager evidence of pretext is insufficient to permit a reasonable fact finder to disbelieve the defendant's articulated legitimate reasons for its reduction in force or to believe that an invidious discriminatory reason was more likely than not a determinative cause of the defendant's actions.[24]

## V. CONCLUSION

Because we find that plaintiffs have failed to proffer sufficient credible evidence on which a reasonable fact finder could conclude that Bally's termination of the plaintiffs was motivated by an age-based animus, whether under a theory of disparate impact or disparate treatment, defendant's motion for summary judgment will be granted, and plaintiffs' cross-motion for partial summary judgment will be denied.

Plaintiffs' remaining claim, that their discharge breached an implied contract of employment, is a state law cause of action within the Court's supplemental jurisdiction. A district court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.A. § 1367. When a federal count is subject to dismissal on a motion for summary judgment, the district court "should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances." *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 196 (3d Cir.1976); *Simmerman v. Corino,* 804 F.Supp. 644, 658 (D.N.J.1992), *aff'd without op.,* 16 F.3d 405 (3d Cir.1993); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

We find no extraordinary circumstances that would justify retention of jurisdiction, and the Court declines to exercise supplemental jurisdiction over the remaining state law claim.

An appropriate order in accordance with this opinion will be entered on even date herewith.

## SCHEDULE 1

### I.

Floorpeople who would have been terminated on application of strict seniority (based on list of 209 floorpeople, Plaintiffs' Ex. 6.)

| NAME | Age on 3/10/92 |
| --- | --- |
| 1. Caesar | 36 |
| 2. Benzulli | 33 |

---

**23.** Defendant argues that the draft release is inadmissible as an offer of compromise under Fed. R.Evid. 408. Because we hold that the release is not probative of an intent to discriminate, the Court need not decide that issue.

**24.** We also note that both plaintiffs were hired when they were already in the protected class. "[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991); *see also MCI Int'l, Inc.,* 829 F.Supp. at 1461 (*citing Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992)); *Waldron,* 849 F.Supp. at 1006 n. 14.

SCHEDULE 1—Continued

| NAME | | Age on 3/10/92 |
|---|---|---|
| 3. | Brower | 36 |
| 4. | Pharaphan | 31 |
| 5. | Van Twuyver | 35 |
| 6. | Uzzardi | 52 |
| 7. | Langton | 35 |
| 8. | Pace | 37 |
| 9. | Mance | 35 |
| 10. | Fruggiero | 41 |
| 11. | Vance | 39 |
| 12. | Tarewicz | 39 |
| 13. | Derogatis | 55 |
| 14. | Dennis | 38 |
| 15. | Dwyer | 35 |
| 16. | Knight | 38 |

## II.

One-game floorpeople who would have been terminated on application of strict seniority (based on list of 39 floorpeople, Plaintiffs' Ex. 7.)

| NAME | | Age on 3/10/92 |
|---|---|---|
| 1. | Cutler | 42 |
| 2. | Stanley | 34 |
| 3. | Cooper | 34 |
| 4. | Gibson | 39 |
| 5. | Curran | 31 |
| 6. | Donatucci | 32 |
| 7. | Cella | 36 |
| 8. | Labor | 49 |
| 9. | Bitting | 34 |
| 10. | Friedland | 44 |
| 11. | Restle | 49 |
| 12. | Maidenbaum | 53 |
| 13. | Ocello | 35 |
| 14. | Merlino | 35 |
| 15. | Klunk | 42 |
| 16. | Corbitt | 49 |

## III.

One-game floorpeople actually fired:

| NAME | | Age on 3/10/92 |
|---|---|---|
| 1. | Stanley | 34 |
| 2. | Cooper | 34 |
| 3. | Curran | 31 |
| 4. | Donatucci | 32 |
| 5. | Labor | 49 |
| 6. | Bitting | 34 |
| 7. | Restle | 49 |
| 8. | Maidenbaum | 53 |
| 9. | Merlino | 35 |
| 10. | Klunk | 42 |
| 11. | Corbitt | 49 |
| 12. | Stanzione | 46 |
| 13. | Fiore | 53 |

| NAME | | Age on 3/10/92 |
|---|---|---|
| 14. | Benedetto | 44 |
| 15. | Decker | 43 |
| 16. | Daly | 42* |

*Daly would not have been fired based on strict seniority. See note 5.