**Harold OLSEN, Plaintiff,**

v.

**Michael E. HEGARTY, et al., Defendants.**

**No. CIV.A. 99–4642.**

United States District Court, D. New Jersey.

Nov. 20, 2001.

Jerry L. Tanenbaum, Schnader Harrison Segal & Lewis, Cherry Hill, NJ, for Plaintiff.

Edward B. Deutsch, McElroy, Deutsch & Mulvaney, Morristown, NJ, and John E. Schadl, McAleese, McGoldrick & Susanin, King Of Prussia, PA, for Defendants.

## OPINION

RODRIGUEZ, District Judge.

This matter is before the Court on motion of Defendants Michael E. Hegarty, Patrick Campbell, Edward Zarnock, Robert M. Occhiuzzi, John Chrysogelos, Jr., Martin D. Jessen, and Joseph A. Natoli ("Defendants") for Summary Judgment pursuant to Fed.R.Civ.P. 56. Plaintiff Harold Olsen ("Plaintiff") has opposed Defendants' motion. For the reasons stated below, the Defendants' motion is denied.

## I. BACKGROUND

This claim arises from the operation and administration of the Operating Engineers Local 825 Pension Fund (the "Plan") between the years 1993 and 1998. Plaintiff is a retired member of the International Union of Operating Engineers Local No. 825, and is a beneficiary of the Plan. He alleges certain violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), arising from the management of his pension fund. Defendant Michael E. Hegarty is the Chairman (now Co-Chairman) of the Board of Trustees of the Pension Fund ("Board"), which is the administrator of the Plan. According to his testimony, Defendant Hegarty became a member of the Board in 1989 and became the Chairman of the Board in the mid 1990's. Defendant Patrick Campbell acted as the Secretary of the Board of Trustees and has been a member of the Board for each fiscal year since July 1, 1991. Defendant Edward Zarnock, Defendant Robert M. Occhiuzzi and Defendant Joseph A. Natoli, were members of the Board of Trustees on September 30 1999, at the time the

Complaint was filed, and had served for varying lengths of time prior to that. Defendant John Chrysogelos, Jr. and Defendant Martin Jessen were not members of the Board of Trustees at the time that the lawsuit was filed but, according to the Complaint, were members during the time period relevant to this lawsuit, beginning in 1995 and 1991 respectively, according to the complaint.

## A. Factual Background

### 1. Brief History of the Fund, its Holdings and its Decision–Making Process

In examining the factual landscape of the present motion for summary judgment, the Court may not resolve conflicting factual contentions. *Paton v. La Prade,* 524 F.2d 862 (3d Cir.1975). The Court is under a duty to construe the facts in the light most favorable to the Plaintiff and the history outlined below will reflect as much.

In November 1955, the International Union of Operating Engineers Local 825, along with a number of other trade associations[1] entered into an Agreement and Declaration of Trust. ("Trust"). The Trust allowed for the creation of a pension fund for the purpose of providing retirement benefits to employee participants. The pension fund was intended to be a "multi-employer plan" as that term is defined by ERISA § 4001. 29 U.S.C. § 1301(a)(3). The Trust laid out rules governing the administration and oversight of the Fund by eight trustees, and defined the rights, duties and obligations of these trustees. Also provided for was a Finance Committee that could act as the delegate of the Fund's investment and finance decisions. In January 1956, the Trustees of the Fund, in accordance with the Trust, created the Local 825 Pension Plan, which is the Plan now at issue.

The Plan provided a contribution and benefit scheme by which an employer's contribution and an employee-participant's retirement and related benefits is calculated. Each participant is entitled to "receive a monthly pension for his or her lifetime based on the vested credited service and the value per credit in effect when the participant last earned one full year of credited service." Sullivan Cert. at Exh. 3 at 14. Plan participants are not entitled to benefit increases above the amount calculated by that method, although any surplus generated was required to be utilized for the benefit of the participants and the Trustees enjoyed the discretionary power to issue benefit increases.[2]

The growth of the Fund over the its first 36 years is largely beyond the scope of this motion. For present purposes, there are two noteworthy factors in the Fund's evolution prior to 1993. First, except for the years 1986 and 1987, employer contributions were greater than benefits paid in every year prior to 1990. Second, as the Fund grew and sought to become less reliant on employer contributions to pay benefits, the Plan became heavily invested in guaranteed investment contracts ("GICs"),[3] a type of fixed-income bond that provided for return of principle on maturity. As of 1989, the Fund had over $264 million dollars invested in GICs. This amounted to roughly 89% of the Fund's

---

1. The other organizations involved in founding the trust were the Associated General Contractors of New York, the Structural Steel and Ornamental Iron Association and the Building Contractors Association of New Jersey.

2. Based on the formula laid out in the Plan at the time of its conception, it is undisputed that the Plaintiff has received all of the benefits to which he is entitled.

3. The Defendants refer to these investments as "guaranteed *insurance* contracts."

total assets. As of November 1992, the proportion of fund assets held in GICs had grown to 91%, before falling to approximately 64% in 1994.

This drop was a result of problems that developed with GICs as investments during the early 1990s, including their diminishing rate of return. Additionally, the Trustees' accounting projections revealed that the rate at which benefits paid would outstrip employer contributions would continue to grow. By the Trustees' estimation, this deficit created the need for the Fund to transition away from the traditional GICs that they had relied on in the past. The overriding concern of the Trustees during the 1990–1992 time period was ensuring the Fund's continued ability to pay out pension benefits. It was also during this period that the Trustees considered forming a bank with the Funds' assets.

Toward that end, a group of Fund advisors and employees began to meet in 1991 to consider investment alternatives. While the meeting minutes of this group refers to it as the "Investment Subcommittee" and Defendants' "Statement of Undisputed Material Facts" ("Defs.' Facts") does the same, Defendant Hegarty testified that:

> [t]here was no committee ever formed by the trustees as an investment subcommittee. When [Joseph Pagano, Esq., the "Secretary"] wrote the minutes up he used to call it the investment subcommittee. I always used to laugh about it. It had no duties or responsibilities. It was there to assist—these individuals who are Fund employees were there to assist me as a member of the Finance/Investment Committee, but it was not a constituted committee with any authority under the Trust. Dep. of Michael Hegarty at 72.

Regardless of its nomenclature, it is clear that a group of Fund employees and ad-visors met nearly every month between 1991 and 1994 in order to discuss and evaluate investment options. Included in this group were Defendant Michael Hegarty, Jerome Foley (investment advisor), Mary Keane (Fund employee who regularly dealt with commercial paper issues), Alan Leiwant (provided Fund with actuarial information), Clara Ciccotelli (Fund administrator), Joseph Pagano (attorney) and Joseph Corcoran (accountant). Defs.' Facts at ¶ 62. Despite this group's lack of official standing within the Trust, it is clear that the official Investment / Finance Committee, which consisted of only Defendant Hegarty and Defendant Campbell, substantively relied on the discussions that occurred in the context of this subcommittee before making recommendations to the full Board.

On November 4, 1991 Defendant Hegarty presented the full Board with the recommendation of the subcommittee and the Trustees agreed to a written investment strategy entitled "Proposal for Asset Diversification for Current Short Term Assets, Current Contributions and Income Only." ("1991 Proposal"). In this Proposal, the Trustees reaffirmed their primary investment policy as one that would "obtain a total rate of return from quality investments to meet plan obligations." Defs.' Facts at ¶ 77. This rate of return had to be "above actuarial assumption," which later was set at 7.5%. The 7.5% rate would become a benchmark for the rest of the Board, as future investments were measured by whether they surpassed this rate of return. Dep. of Jerome Foley at 78. The Proposal also contained certain diversification requirements, laying out specific investment vehicles that were "recommended" and prohibiting participation in "puts, calls, straddles, short sales and pair offs, strips, residuals, zero coupon bonds, and corporate obligations

rated lower than 'A.'" Sullivan Cert. at Exh. 18 at 5. Investments in common stock were not prohibited. Despite being adopted in 1991, this Proposal is relevant because it laid the groundwork for the investment strategy well into the time period described in the complaint.

Following the introduction of the Proposal, monthly meetings of the subcommittee group were held in order to monitor and discuss the investment portfolio of the Fund. Beginning at their April 2, 1992 meeting, the subcommittee began to track a model stock portfolio, comprised of 15 different utility stocks at 100,000 shares each. From time to time, the subcommittee would check on the model portfolio to compare how an investment there would have fared against their actual investments. The subcommittee thus considered the possibility of non-fixed income securities as early as 1992.

Based on their discussions during this period, the subcommittee committed to a dramatic reduction of the fund's GIC holdings. This had been a goal of the subcommittee since at least August 1992, when the meeting minutes expressly lay out the goal of reducing the percentage of GIC holdings from over 90% to under 50% in five years. As noted above, this goal had not been met by 1994.

The full Board of Trustees met quarterly between 1992 and 1994 in order to receive reports from the actuary and accountant regarding employee contributions, investment income, benefits paid, actuarial assumptions, expenses, net assets, and actuarial liability. At these meetings, Defendant Hegarty would usually present an investment report that summarized new investments, maturing GICs, rates of return, both current and projected. Hegarty also recommended amendments to the 1991 Proposal and offered resolutions for vote by the full Board. There is no evidence in the record that Hegarty's investment recommendations were ever rejected or critically examined at the Board meetings.

The work of the investment subcommittee and Defendant Hegarty reached a head in June 1994 when they presented an "Investment Policy for Operating Engineers Local 825, Pension, Annuity, Welfare, Out-of Work and Savings Funds" ("Policy"), which was voted upon and approved by the Board. Sullivan Cert. at Exhs. 54 & 55. This Policy was designed to be a replacement and update of the 1991 Proposal and was built upon the subcommittee's experience of the last 3 years. The Policy reflected a growing concern among the subcommittee concerning the trend of diminishing employee contributions relative to benefits paid.

The Policy categorized recommended investment vehicles into 3 distinct classes. Id. Similar to the Proposal, the Policy outlined some prohibited types of investment vehicles. Common stock was not included on this prohibited list. Safeguards were put in place to ensure that the Fund was properly diversified across lines of "issuer, industry, geography and purpose." Sullivan Cert. Exh. 54 at 3–4. Pursuant to the Policy, both Defendant Hegarty and Mr. Foley had the permission to purchase or sell investment vehicles "so long as the criteria contained in the investment policy were followed." Defs.' Facts at ¶ 111.

In accordance with the Policy, Defendant Hegarty and Mr. Foley led the effort to broaden the investment holdings beyond GICs. This was done both because much of the Fund's GIC holdings would be maturing over the next few years and because the Trustees no longer wished to be locked down in GICs that were not marketable. The following months saw the Fund's portfolio move away from GICs and into other

fixed-income vehicles, with an emphasis on government-issued bonds, and other investments within the credit industry. This included a modification to the Policy that recommended the previous mark of 50% in government issued vehicles be allowed to float upward. The investments following the adoption of the Policy continued to be measured against the 7.5 % benchmark.

The transition away from GICs marked a potential sea-change in the life of the Funds. It represented an opportunity for the Trustees to reinvest much of the asset base that had been tied up in non-marketable GICs into new vehicles. Defendant Hegarty testified that at the time this transition was occurring, his decision, made with the assistance of the investment subcommittee, was that the credit industry represented the safest and easiest strategy.

> Looking at it from the prospect of transition of hundreds of millions of dollars with having the least amount of risk at that particular point during the transition, which is your most vulnerable time, the way that it came about as the best path of least resistance and least risk was to go to the credit market. And that was a proposal that was taken to the Board and that's what the Board voted to do. Dep. of Michael Hegarty at 103.

When asked if the Trustees had considered transitioning the maturing GIC funds into other types of investment vehicles, Defendant Hegarty explained that he had run some scenarios that revealed different mixes of investments, but that his ultimate decision was to stay in the credit markets because it would mean a "more orderly transition." *Id.* at 68. None of the Trustees compared their prospective strategy or past rate of return against the S & P 500 Index. *Id.* at 103. Finally, when pressed specifically on why the Trustees had ignored investments in equities, Defendant Hegarty cited the large fees that would inevitably result from having to manage, monitor and conduct the constant transactions that accompany stock investments. *Id.* at 233–35. Defendant Hegarty also explained that because the Trustees had no one capable of performing those tasks within the Funds, outside brokers and managers would have to be utilized at high costs to the Funds. *Id.*

It was only in early 1997 and beyond that the Funds began to invest in common stocks. Defs.' Facts at ¶ 124. By June 30, 1998, the aggregate investments in common stock represented about 4% of the Fund's total assets. *Id.* at ¶ 125. These included stocks that Defendant Hegarty considered to be "blue chip," although some Trustees were not even aware which stocks were being bought by the Funds. Dep. of Robert Occhiuzzi at 97–99. It can be fairly stated, then, that throughout the relevant time period the Fund's investment holdings were comprised primarily of GICs and fixed-income bonds (with a particular focus on government-issued bonds).

The record reveals a process of investment purchasing that leaves little doubt as to where the locus of decision-making power rested. Defendants Hegarty and Campbell, in conjunction with Mr. Foley would decide on a particular investment or line of investments. That vehicle would be discussed to some degree in the context of the monthly investment subcommittee meetings, in the context of the status of the Plan. These meetings included updates and projections from the actuary and accountant. Defendants Hegarty and Campbell or Mr. Foley would make the purchase and then only later submit a report to the full Board of Trustees. Inevitably, the full Board, upon receiving an investment report at their quarterly meeting, would adopt Defendants Hegarty and Campbell's

purchase or sale decisions after the fact, without question or debate as to either the specifics of that particular investment or how this single purchase fit into the overall investment strategy of the Fund.

This process is apparent both in the deposition testimony of the individual Trustees, as well as from a review of the Trustee meeting minutes. For example, the first time that Defendants Hegarty and Campbell along with Mr. Foley decided to invest in equities, a step that departed from their past practice, the Board was notified via a Memorandum, written the previous day and presented at their meeting on March 27, 1997. Sullivan Cert. at Exh. 62. The memo, in pertinent part, reads, "Equities [ ] are now being added to the Pension's portfolio as the Subcommittee has determined that the fund is now large enough to allow for any long term holding, 10 to 15 years, that may be necessary to achieve a return of 150 basis points above our assumptions. See attached sheets for equities chosen to date." *Id.* This is clearly not a proposal, but rather a report informing the Board that a decision has already been made. The investment process after the 1994 Policy was put in place followed this pattern, with the full Board accepting each and every one of the Hegarty, Campbell and Foley decisions.

The parties here do not agree on the proper manner by which to determine the amount of cash that was available to invest in other vehicles during the time period in question. The Defendants maintain that part of what prompted the 1994 Policy was a concern over shrinking cash flow and increasing actuarial liability. Plaintiff maintains that the Defendants had a large amount of cash run-off from their investments at that time that could have been used to create a more diversified investment portfolio.

With this review of the actual process of decision-making that occurred over the course of the Plan's history in mind, this Court will review the background of each Defendant.

2. *Qualifications of the Trustees to Make Investment Decisions*

a) *Michael Hegarty*

Defendant Hegarty attended general college courses at Saint Mary's University in San Antonio, Texas and at the County College of Morris in Randolph Township, New Jersey. He also attended one seminar that outlined the duties of a trustee sponsored by the Association of General Contractors. He has never had any formal training on investment strategy or pension fund management, although he did attempt to educate himself by reading the Wall Street Journal and the pamphlets, newsletters and reports sent to him by an international association of trust funds.

b) *Patrick Campbell*

Defendant Campbell took night classes on labor law and introductory investment strategies at a community college in Monmouth County and read books on investing both in connection with that course and on his own. He also testified that he read the materials sent out by the trust association. Defendant Campbell admitted however, that he did not have any expertise in investing in the stock market and sought the help of outside consultants for these matters.

c) *Edward Zarnock*

Defendant Zarnock has a bachelor's degree from the Empire State College of the State University of New York. His college training did not involve investing. Defendant Zarnock has attended a number of seminars put on by the Foundation of Employees Benefits Conference within the

last 15 years, including an introductory course for new trustees. For the most part, these courses dealt with plan administration, including topics like health care policy and technology advances. Defendant Zarnock has received no special training in investment strategy and testified that he learned about investing from listening to radio and watching television.

d) *Robert Occhiuzzi*

Defendant Occhiuzzi has a bachelor of arts degree from Seton Hall University, where he took classes in accounting and economics. He likewise testified at his deposition that he did not have any specific training or expertise in investing or managing a pension fund.

e) *John Chrysogelos*

Defendant Chrysogelos has taken some college courses in civil engineering and property casualty insurance. He attended the same seminar that Defendant Zarnock attended, which covered the role of the management trustee, especially with regard to health care, fund administration and liability insurance. Other than this, Defendant Chrysogelos had no formalized training for his duties as a trustee and possessed no specific expertise as to investing.

F. *Martin Jessen*

Defendant Jessen had not read any books either with regard to investment strategies generally or as to specific methods of investing for pension plans. Further, at deposition, Mr. Jessen testified that he did not consider himself capable of managing an investment portfolio involving the stock market while he was a trustee.

G. *Joseph Natoli*

Defendant Natoli completed a three year college program in construction tech-nology at the Newark College of Engineering. He has not taken any courses regarding the management of pension funds or employee benefit funds. Again, Defendant Natoli testified that he gained the bulk of his knowledge regarding his role as a trustee from the informational material he received through the mail. Defendant Natoli also testified that he did not directly participate in evaluating individual investment decisions. Instead, when shown data regarding a particular kind of investment, he stated that "I did not partake in evaluating this information. I relied upon the investment committee. The only thing I evaluated was the net results." Dep. of Joseph A. Natoli at 38.

3. *Expertise Considered by the Trustees*

Throughout the course of the 1990s, the Defendants relied, to some degree, upon the expertise of others in making investment decisions. Significant among these contacts was Jerome Foley, who had an extensive career in the banking industry. At the time he was being considered for employment by the Trustees, Mr. Foley was the senior vice president of a bank, where he dealt with commercial lending issues. Sullivan Cert. at Exh. 20. Prior to that time, he had been successful in top executive positions at banks of varying sizes. *Id.* He also spent three years at an investment firm where he received his Series 63 and Series 7 licenses. *Id.* Prior to his involvement with the Fund, Mr. Foley did not have any experience managing investments for defined benefit plans, although he had been a trustee responsible for making investment decisions for another fund. Dep. of Jerome Foley at 30. Instead, the bulk of his experience was in the credit industry.

Defendant Hegarty had known Jerome Foley from previous business dealings with

his family and Mr. Foley was originally brought in part-time to perform research on different investment ideas generated by Defendants Hegarty and Campbell. Mr. Foley's relationship with the fund was formalized in the 1991 Proposal, wherein he was granted full authority to make and execute investment transactions on behalf of the fund, so long as the transactions fell within the Proposal's criteria.

In January 1994, Defendant Hegarty reported to the Board that the subcommittee recommended that the Board hire Jerome Foley on a full-time basis as a finance/investment manager. This job position would include the responsibility to compile an annual budget for all funds, prepare monthly cash-flow reports and build, from those reports, annual investment strategies. Mr. Foley did not go through a formal interview process for this full-time position, but rather was hired based on the part-time work that he had done in the years preceding 1994 and his preexisting relationship with Defendant Hegarty. Based on the recommendation of the subcommittee, the full Board voted to hire Mr. Foley for this position. The subsequent quarterly meetings of the Trustees each included an investment report section wherein Mr. Foley would present a written summary to the Trustees outlining the current composition of the Fund's assets and updating the Trustees on the most recent transactions.

Prior to the time period relevant to this suit, the Trustees also retained the services of a "futurist." In 1991, at a critical juncture the investment life of the Plan, Paul Nadler, a professor at Rutgers University, was asked to make a presentation hypothesizing ideas for the future based on the history and current status of the Plan's asset base. Dep. of Michael Hegarty at 44–48. Defendant Hegarty testified at his deposition, however, that this consultant did not offer his opinion on the current investment strategy of the Plan. *Id.* at 48.

The law firm of McCarter & English was consulted to discuss alternative strategies for the Fund, including the establishment of a bank. An August 31, 1992 letter from attorney Todd Poland, submitted at the next subcommittee meeting, evidences a meeting between Defendant Hegarty, Mary Keane and Mr. Poland to discuss the costs associated with investigating the opening of a bank. While the fund never attempted to actually open a bank, there is evidence that this was an investment option that was considered by at least some of the Trustees.

The subcommittee meeting minutes also reveal isolated single occurrences of investment expertise offered to the Board. On January 15, 1992, Edward Tirello, Managing Director of Research at Smith Barney presented at the committee meeting and discussed the decision to hold certain corporate bonds. In response to the prospect of the Plan transferring the assets from two Prudential GICs into a new GIC, the committee considered the opinion of Marcellus King, the Director of Marketing for Prudential Asset Management. Sullivan Cert. at Exh. 27 at 2. On November 19, 1992, the Subcommittee heard from 4 outside investors, including a representative from Pension Investments in Princeton, New Jersey. Whether the presence of these outside persons at the Trustee meetings indicates an attempt to seek out objective expertise or is an occurrence of investment salesmanship is unclear. What is clear is the fact that the Trustees were, at the very least, considering different investment options.

Overall, the record shows that the Defendants displayed a distaste for the use of outside investment advisors or money managers during the six years prior to 1999. As noted above, Defendant Hegarty

was wary of the costs that accompanied the use of money managers and stock advisors. Dep. of Michael Hegarty at 233–35. At the July 9, 1992 subcommittee meeting, Jerome Foley introduced a report by the Brookings Institution questioning the cost-effectiveness of professional money managers. Dep. of William Allbright, C.P.A. at 170–71. These instances were part of a broader theme of distrust for the services of investment advisors, whom Defendant Hegarty viewed as usually attempting to advance no other interest but their own. Dep. of Michael Hegarty at 172.

## II. DISCUSSION

The Defendants first argue that there is no genuine issue of material fact to be decided at trial because the Plaintiff lacks Article III standing to bring his claim. Mr. Olsen has not been deprived of any of his benefit payments and has been given all that he was promised as a participant in the Plan. According to the Defendants, therefore, he has not suffered the direct, concrete injury required to make out a case or controversy under Article III. The Defendants also contend that the Plaintiff's claims are time-barred by ERISA's statute of limitations provisions. Lastly, the Defendants' vigorously dispute the Plaintiff's claim that the Trustee's actions during the relevant time period amount to violations of ERISA's fiduciary requirements of prudence and diversification

### A. *Standard for Summary Judgment*

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine"

if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of its pleading. *Id.; Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1258 (D.N.J.1994).

On a motion for summary judgment, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 242–43, 106 S.Ct. 2505. Credibility determinations are the province of the factfinder and are not to be made at the summary judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

### B. *Standing*

█ Initially, the Defendants argue that Plaintiff Harold Olsen lacks standing to bring this claim. The Defendants' argu-

ment is premised upon the contention that the Plaintiff has suffered no direct, concrete injury because he has received all of the benefits promised him under the Plan. In this regard, the Plaintiff has not personally been affected by the alleged misdeeds of the Defendants and therefore, they argue, is not entitled to constitutional standing to bring this claim.

■ The Supreme Court has reduced the tenets of Article III standing to three necessary requirements. First, the plaintiff must show that he has suffered an injury-in-fact that is, on the one hand, direct, concrete and particularized and on the other, actual and not hypothetical or conjectural. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, this injury must be "fairly traceable" to the conduct of the defendant. *Id.* at 560–61, 112 S.Ct. 2130 (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Lastly, it must be within the power of the court to redress the harm suffered by the plaintiff. *Id.*

The Defendants lean heavily upon *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), to support their standing argument. In *Lujan*, the Supreme Court was faced with a challenge to a regulatory rule promulgated by the Secretary of the Interior interpreting a section of the Endangered Species Act. *Lujan*, 504 U.S. at 557–58, 112 S.Ct. 2130. The claim was brought by a group of environmental preservationists that desired an interpretation of the Act extending its reach into foreign nations. *Id.* at 559, 112 S.Ct. 2130. According to the plaintiff-respondents, any other interpretation of the Act would result in an accelerated rate of extinction of certain species of wildlife. *Id.* at 562, 112 S.Ct. 2130. The preservationists offered several theories to

establish their standing, including one based upon the "citizen-suit" provision of the Endangered Species Act, which allowed any person to enjoin the United States, its agencies or any other person believed to be violating the Act. *Id.* at 571–72, 112 S.Ct. 2130; 16 U.S.C. § 1540(g).

In *Lujan*, the Eighth Circuit below held that the respondent suffered a procedural injury when the Secretary had allegedly violated the interagency consultation requirements of the Act. Justice Scalia characterized the lower court's decision as holding "that the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Lujan*, 504 U.S. at 573, 112 S.Ct. 2130 (emphasis in original).

The *Lujan* Court rejected this view, unfavorably comparing it to the long line of the Court's jurisprudence requiring plaintiffs to articulate more than a "generally available grievance about government." *Id.* (referencing *Fairchild v. Hughes*, 258 U.S. 126, 129–30, 42 S.Ct. 274, 66 L.Ed. 499 (1922)). Justice Scalia's opinion, however, is very clear on limiting the scope of this ruling. "To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to transfer from the President to the courts the Chief Executive's most important constitutional duty . . . ." *Id.* at 577, 112 S.Ct. 2130. The separation of powers foundation upon which Justice Scalia rests his decision reveals why *Lujan* can offer no aid to the Defendants' standing argument.

At issue here is not a congressional attempt to bestow upon the general public a right to usurp, through the assistance of the judiciary, the enforcement power of the executive. Rather, 29 U.S.C.

.

§ 1132(a) provides for the effect of ERISA's primary purpose, that of protecting the integrity of benefit *plans,* and not their beneficiaries. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 139–43, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) ("It is of course true that the fiduciary obligations of plan administrators are to serve the interest of participants and beneficiaries.... But the principal statutory duties imposed on the trustees relate to the proper management, administration, and investment of fund assets...."). Congress accomplished this goal by allowing suits to be brought by a carefully defined group of litigants against private individuals with fiduciary responsibilities.[4] Only "the Secretary, or [ ] a participant, beneficiary or fiduciary" may bring suit to redress a violation of the Act. 29 U.S.C. § 1132(a). This is different from the "congressional conferral upon *all* persons of an abstract, self-contained, non-instrumental 'right'" rejected by Justice Scalia. *Lujan,* 504 U.S. at 573, 112 S.Ct. 2130 (emphasis in original).

The concrete injury-in-fact required by Article III was not abrogated by Congress in enacting this provision. Nor does the Plaintiff seek to use his status as a Plan participant as a talisman that waives his obligation to establish constitutional standing. It is Mr. Olsen's interest in the integrity of his retirement plan, his congressionally-ensured right to a solvent and prudently managed Fund, that constitutes his cognizable interest.

█ The congressional provision of standing in this context is a manifestation of the notion that "[t]he ... injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the

invasion of which creates standing.'" *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). In enacting § 1132(a), Congress created a legal right in participants to ensure the well-being of their overall plan by bringing suit to enforce ERISA obligations. It is for this reason that "[a]n individual beneficiary may bring a claim for breach of fiduciary duty only for the benefit of the plan." *Bowles v. Reade,* 198 F.3d 752, 759 (9th Cir.1999). The fiduciary obligations of ERISA run to the plan itself and not to the individual participants. *Herdrich v. Pegram,* 154 F.3d 362, 380 (7th Cir.1998), *rev'd on other grounds,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). Therefore, if this Court accepts the Plaintiff's allegations of fiduciary misdeeds, as it must for the purposes of ruling on the Plaintiff's standing, it is clear that he has suffered a direct, concrete injury-in-fact.

The Plaintiff must also satisfy the two other requirements that ground constitutional standing. As for causation, there can be little doubt that the Defendant Trustees were responsible for the alleged acts of imprudence, as it is their actions that are called into question by the Plaintiff. The final constitutional requirement is that of redressability. In support of their argument that the Plaintiff's harms cannot be redressed by any relief granted by this Court, the Defendants cite to *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In *Steel Co.,* the plaintiff environmental group claimed that the defendant steel manufacturer had violated a federal statute that required it to fulfill

---

4. Indeed, Justice Scalia infers that his *Lujan* opinion does not extend to suits against private individuals when he writes, "it is clear that *in suits against the Government, at least,* the concrete injury requirement must remain." *Lujan,* 504 U.S. at 578, 112 S.Ct. 2130. (emphasis added).

certain reporting requirements. In addition to a declaratory judgment, the plaintiff group sought to have fines imposed on the Defendant, to be paid to the United States. The Court based its decision on redressability, holding that because the monetary benefit of the fines would not enure to plaintiff, it had no ability to redress the harm suffered by that group. Here, Defendants argue that because any relief that would be granted by this Court would enure to the Plan and not to the Plaintiff himself, a similar rationale should be applied.

The Defendants' redressability argument fails for reasons similar to those explained in the concrete injury analysis above. If the Plaintiff's alleged injury is made up of the harm that the Plan suffered from the Defendants' neglect, relief under 29 U.S.C. § 1109, in the form of either restitution to the Plan or removal of the offending Trustees, will act to ensure that the Plan is protected in the future and compensated for the past. Both of these outcomes would redress the Plaintiff's alleged injury.

## C. *Statute of Limitations*

### 1. ERISA's Three Year Statute of Limitations

■ The Defendants argue that the Plaintiff's action is time-barred under 29 U.S.C. § 1113 because Mr. Olsen had actual knowledge of the investment allocation of the Fund more than three years prior to the filing of this suit.

29 U.S.C. § 1113 provides, in part, that:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation. 29 U.S.C. § 1113.

The Plaintiff filed this lawsuit on September 30, 1999. The question before the Court, then, is whether Mr. Olsen had actual knowledge, within the meaning of § 1113, of the alleged ERISA violations at. any time prior to October 1, 1996.

The Third Circuit has described § 1113's actual knowledge standard as "stringent" and "rigorous." *Gluck v. Unisys Corp.* 960 F.2d 1168, 1176, 1177 (3d Cir.1992). In order for the limitations period to begin running, the Third Circuit has required "a showing that the plaintiffs actually knew not only of the events that occurred which constitute a breach or violation but also that those events supported a claim . of breach of fiduciary duty or violation under ERISA." *Montrose Medical Group v. Bulger,* 243 F.3d 773, 787 (3d Cir.2001) (quoting *International Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. Murata Erie N. America, Inc.,* 980 F.2d 889, 900 (3d Cir.1992)). However, the actual knowledge requirement has not been interpreted so narrowly that "the statute of limitations can never begin to run until a plaintiff first consults with a lawyer." *Gluck,* 960 F.2d at 1177.

The Defendants base their argument on the fact that Plaintiff, like all Plan beneficiaries, received an annual report that included in it a breakdown of investment income, asset allocation and overhead fees, among other things. Further, the Defendants assert that because Mr. Olsen testified at his deposition that he had knowledge of the Fund's asset allegation "four or five years ago" that this necessarily means that his claim is time-barred. Dep. of Harold Olsen at 58. The Defendants' argument fails to grasp that the nature of Plaintiff's claim is not rooted, per se, in the

makeup of the Plan's investment portfolio. Rather, it is the behavior, both individually and institutionally, of the Plan management that is at issue.

While it is true that the asset make-up of the Plan might suggest the presence of fiduciary misconduct, it cannot be said that because Olsen had access to the raw data of the investment scheme, he was also aware that there were facts to "support[ ] a claim of breach of fiduciary duty or violation under ERISA." *Bulger,* 243 F.3d at 787. Without knowledge of the process used to arrive at investment decisions, it would be impossible for the Plaintiff to realize that the Trustees had violated their fiduciary responsibilities. In analyzing a similar issue, the Fifth Circuit held that "[i]nasmuch as appellants are challenging the actual selection of [one particular investment], they must have been aware of the process utilized by [one particular plan sponsor] in order to have had actual knowledge of the resulting breach of fiduciary duty." *Maher v. Strachan Shipping Co.,* 68 F.3d 951, 956 (5th Cir.1995). The same holds true here. At no time prior to October 1, 1996 did Mr. Olsen have knowledge sufficient to make out a claim under ERISA for a breach of fiduciary duty of prudence.

Likewise, the Plaintiff lacked the requisite knowledge to prosecute a valid claim for a violation of ERISA's requirement of diversification. As is shown below, a violation under 29 U.S.C. § 1104(a)(1)(C) must take into account all of the circumstances of the Plan, including the investment scheme necessary to continue viability into the future. While it is true that Plaintiff was made aware of the asset allocation of the Plan, there is no evidence that he was made aware of all of the surrounding circumstances and contextual facts necessary to put forward a claim for breach of fidu-

ciary duty based on grounds of failure to diversify.

**2. ERISA's Six Year Statute of Limitations**

For the first time in their reply brief, the Defendants also raise the argument that all ERISA violations that occurred prior to October 1, 1993 are time-barred under § 1113's six-year statute of limitations. Under that section, claims are prohibited "six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation ..." 29 U.S.C. § 1113(1).

In the first count of the Plaintiff's complaint, filed September 30, 1999, he alleges that "[f]or at least the past six years, defendants breached their fiduciary duty...." Compl. at 4. Similarly, the second count alleges that "[f]or at least the past six years, defendants have breached their duty to act with care, skill, prudence and diligence in their capacity as members of the Board of Trustees of the Plan...." Compl. at 4–5. It is unnecessary, therefore, to discuss the Defendants' argument that the Plaintiff's claims prior to October 1, 1993 are time-barred by ERISA's six year statute of limitations. The Plaintiff has so limited himself.

**E. *Failure to Diversify under ERISA §***

■ The Defendants also move for summary judgment based on the Plaintiff's claim that the Trustees' actions during the time period between 1993 and 1998 violate 29 U.S.C. § 1104(a)(1)(C), the ERISA section that guards against undiversified investment schemes that subject ERISA plans to undue risk of loss. Under this section, if the plaintiff meets his initial burden of establishing a failure to diversify, the burden thereupon shifts to the de-

fendant to prove that even though not diversified, the allocation was nonetheless prudent. *In Re Unisys Savings Plan Litigation,* 74 F.3d 420, 438 (3d Cir.1996).

■ The Third Circuit has described ERISA's diversification requirement as one that prohibits a fiduciary from investing the whole or an unreasonably large proportion of the trust assets in either one type of security or different securities that are all dependent on the welfare of one industry or the conditions in one particular geographic location. *In Re Unisys Savings Plan Litigation,* 74 F.3d at 438 (3d Cir.1996) (citing H.R. Conf. Rep. No. 1280, 93d Cong., 2d Sess. (1974)). There is no empirical formula used to determine whether a portfolio is adequately diversified. *Id.* at 438. Rather, a fiduciary is bound to consider a host of factors particular to their own trust in order to determine an appropriate mix of investments. These factors include: "the purposes of the plan; the amount of the plan assets; financial and industrial conditions; the type of investment, whether mortgages, bonds or shares of stock or otherwise; distribution as to geographic location; distribution as to industries; dates of maturity". *Id.* (citing same congressional report, *reprinted at* 1974 U.S.Code Cong. & Admin. News 5085). This motion, therefore, must be evaluated within the context of the specific contours and goals of the Plan at issue.

■ The Defendants observe that over the course of the relevant time period, the percentage of the Pension Fund's assets invested in GICs dropped from 78.38 % in 1993 to 63.36% in 1994 to 35.71% in 1996. Def.'s Br. in Support of Motion for Summary Judgment at 31. The remaining portion of the portfolio was invested in Government issued bonds, highly rated corporate bonds, commercial paper and other fixed income securities. *Id.* As GICs were decreasingly a part of the portfolio in the years 1997 and 1998, the Fund invested more heavily in government securities and began their foray into common stocks. *Id.* All of this was done with the paramount goal of the Plan's investment scheme of "obtain[ing] a total rate of return from quality investments to meet plan obligations." Defs.' Facts at ¶ 77. The Plan's stated method of achieving this aim was to invest in securities whose rate of return would exceed the 7.5% benchmark determined to be the minimum necessary to meet benefit obligations into the future.

Applying the congressionally defined factors to the Plan, this Court cannot find that there is a complete absence of genuine issues of material fact. To begin with, because this evaluation "must be based on all surrounding facts and circumstances, the question of whether the defendants satisfied their duty is a quintessential jury question and not proper for determination on a motion for summary judgment." *Aviani v. Sisters of St. Mary,* 1987 WL 18934 (N.D.Ill.1987); *cf. Pension Fund–Mid Jersey Trucking Industry–Local 701 v. Omni Funding Group,* 731 F.Supp. 161, 169 (D.N.J.1990) (noting the inappropriateness of summary judgment for deciding whether a defendant's actions violate ERISA's fiduciary duties).

With regard to the Plan's heavy, but decreasing emphasis on GICs in years immediately following 1993, the Defendants believed that "the whole market of the GIC ... was all diversified within itself." Dep. of Michael Hegarty at 211. In other words, the Defendants believed that an all GIC approach did not subject the Plan to a high risk of loss because the insurance company issuing the GIC ensured that the investment was ultimately diversified across lines of industry and geography. This belief is supported by the legislative history of § 1104(a)(1)(C), where a conference report concluded that "generally a plan may be invested wholly in insurance or annuity contracts without violating the

diversification rules, since generally and insurance company's assets are to be invested in a diversified manner." H.R. Conf. Rep. 93–1280, *reprinted in* 1974 U.S.C.C.A.N. 5037, 5085.

The Defendants' summary judgment motion must be denied, however, because there are still issues of genuine fact to be resolved on this point. The Plaintiff has offered expert testimony opining that the Plan's unfunded liability grew considerably between the years 1993 and 1998. Cert. of Jerry Tanenbaum at Exh. G at 6, Table 4. In light of this environment, it may be that the anticipated needs of the Plan's future beneficiaries required a prudent investor to at least consider alternative investment allocations beyond fixed-income securities, regardless of the GIC-issuers' efforts to diversify across lines of industry and geography, or of the stability of government and corporate bonds. The language of the congressional report makes clear that a fiduciary must diversify the portfolio both with regard to the actual investments selected and with the *type* of security chosen. 1974 U.S.C.C.A.N. at 5085; *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729, 732 (11th Cir.1990) (holding that a portfolio consisting primarily of long-term government bonds was not sufficiently tailored to the particular needs of the plan at issue, even though the bonds were "liquid and carried minimal credit risk."). When considering all of the circumstances surrounding the Plan, Plaintiff has succeeded in illustrating that there exists a genuine issue of material fact as to whether the Plan's asset allocation met the diversification standard of § 1104(a)(1)(C), so as to avoid undue risk of loss.

D. *Breach of Fiducuary Duty to Act Prudently under ERISA § 404(a)(1)(B)*

The Plaintiff's second claim is that the Defendants' conduct during the relevant time period amounts to a violation of 29 U.S.C. § 1104(a)(1)(B), the ERISA section that requires fiduciaries "to act with the care, skill, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise with like character and with like aims." *In re Unisys Savings Plan Litigation,* 173 F.3d 145, 153 (3d Cir.1999).

To establish this claim, the Plaintiff argues that the Defendants' investment strategy and decision-making process during the relevant time period were inadequate when compared to the course that would have been taken by reasonably prudent investors. The Plaintiff contends that between the years of 1993 and 1998, the Plan's investment holdings consisted almost wholly of fixed income investment vehicles. The decision-making process that justified this makeup, according to the Plaintiff, was marked by uneducated assumptions, a lack of independent investigation, and a failure to obtain needed expertise as to the best way to meet the Plan's goals.

The Plaintiff argues that the overall investment strategy was the result of the majority of Trustees merely attending monthly meetings and rubber stamping the judgment of Defendants Hegarty and Campbell, along with Mr. Foley, thereby abdicating their duty to make informed and independently investigated investment decisions. Further, the Plaintiff asserts that the Defendants had the necessary cash flow available to them with which to broaden their holdings beyond fixed-income investments, yet neglected to do so. Lastly, the Plaintiff argues, as he must, that, when compared to sound and prudent investment principles, the conduct of the Defendants during this time period subjected the Plan to large losses.

In response, the Defendants argue that there is no evidence of any of the self-dealing, conflict of interest or other prohibited transaction issues that are typically the mark of an ERISA violation. The Defendants characterize the Plaintiff's claim as one that complains only that the Trustees failed to invest any of the Fund's assets in the stock market. According to the Defendants, the Plaintiff wishes the Court to deem this a per se violation of their fiduciary duties, given the meteoric rise in the stock market over the relevant time period in comparison with the relatively modest return in the subject portfolio. This claim, say the Defendants, cannot be sustained as it calls upon the Court to reference hindsight in evaluating the investment decisions of the Trustees, who could not have been expected to anticipate the boom that occurred in the stock market over that time period. Further, the Defendants maintain that their decisions were informed, justifiable within the stated goals of the plan and successful, even if conservative.

 Whether the Defendants have violated their fiduciary duty of prudence cannot be decided solely based on a comparison of the Plan's performance in light of the ideal return of a portfolio with a similar purpose over the same time period. It is not within the province of this Court to create an artificial standard of return, against which all portfolios are measured to determine whether a violation of fiduciary duty has occurred. Rather, this Court must examine and analyze the particular behavior and decision-making processes that account for these investments and determine whether these actions or omissions were so imprudent as to constitute a violation of ERISA § 404(a)(1)(B), regardless of the outcome of the investment. *In*

*re Unisys Savings Plan Litigation,* 173 F.3d 145, 153 (3d Cir.1999) (reiterating that ERISA's prudence requirement focuses on "a fiduciary's conduct in arriving at an investment decision, not on its results, and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.") (quoting its own decision in an earlier stage of the litigation); *accord Donovan v. Walton,* 609 F.Supp. 1221, 1228 (D.C.Fla.1985) (urging consideration of "the trustees' *conduct* and not the success or failure of the investment") (emphasis in original) (quoting *Donovan v. Cunningham,* 716 F.2d 1455, 1467 (5th Cir. 1983)).

This axiom, however, cuts both ways. Just as it is true that the Court may not assume a violation of fiduciary duty based upon evidence of severe losses alone, neither may the Court conclude that these same duties were not violated simply because the Fund did not suffer huge actual losses.[5] Critically, the element to be examined under 29 U.S.C. § 1104(a)(1)(B) is the conduct and behavior of the trustees. Having undertaken this task, the Court cannot conclude that there is an absence of genuine issues of material fact.

 The record shows that the Trustees themselves were, for the most part, not qualified to manage the investments of a pension fund based on their own backgrounds, experiences, skills and knowledge. Of the Defendants not directly involved with the investment subcommittee, none had any formal education on investment strategy or methodology and only Occhiuzzi had taken formal courses that even remotely related to economic theory. These Defendants testified that what they did know of investing, they learned from

---

**5.** Of course, in order to make out a successful claim for an ERISA violation, a plaintiff must show that his fund has suffered some economic harm. This point is addressed below.

isolated seminars on peripherally relevant subjects, from trade materials mailed to them by organizations that cater to trustees and from the popular media. During the course of their depositions, nearly all of these Defendants admitted that they lacked the ability to independently manage a pension fund portfolio. Indeed, when asked during deposition to define a GIC, the vehicle that formed the bulk of the Fund's investments during the early 1990's, several of the Trustees were only able to give vague, inaccurate answers.

Instead of making independently informed and researched choices, these Trustees evaluated the investment decisions of the investment subcommittee by simply reviewing the rate of return to make sure it met or exceeded the 7.5% benchmark that they had previously outlined. It appears that the Trustees not involved directly with the investment subcommittee only passively approved investment decisions without further query, so long as it satisfied the descriptive mandate of the investment policy and met or exceeded this rate of return. The record shows that some Trustees were unaware of investment purchases being made, did not participate in meaningful discussions regarding the purchases and took on faith that those Trustees responsible for the decisions were diligently researching the consequences of their actions. See, e.g., Dep of Robert Occhiuzzi at 98–99 (recounting testimony of a trustee who when asked how he knew that the trustees making the investments actually researched those decisions, answered "[w]ell, I don't.").

Because the trustees not involved with the investment committee wholly relied upon the decisions made by Hegarty, Campbell in concert with their advisors, considerable focus should be placed there. To begin with, it should be noted that the investment subcommittee had no legitimate function or authority under the terms of the Trust. In his deposition, Defendant Hegarty testified that the name "investment subcommittee" was manufactured by Joseph Pagano when he recorded the minutes to their meetings. While the record shows that this group did meet on a regular basis, it also indicates that its function was limited to helping inform the investment decisions of Defendants Hegarty and Campbell, who were the sole members of the official "Investment Committee" created under the terms of the Trust.

The record's reflection of the activities of the investment subcommittee is such that it creates a genuine issue of material fact as to whether the Defendants acted in violation of ERISA § 404(a)(1)(B). Defendants Hegarty and Campbell were admittedly not capable of managing the investment portfolio of the fund without outside expertise. It was for this reason that they gathered around themselves the advisors that formed the investment subcommittee. While it is true that advisor Jerome Foley did have an extensive career in commercial lending, this Court cannot conclude as a matter of law that Defendants Hegarty and Campbell's reliance upon his research without other perspectives and opinions met their fiduciary obligations of prudence under § 404(a)(1)(B).

The Third Circuit has been faced with the decision of whether a trustee's decisions violate ERISA's prudence requirement, where, as here, those decisions are premised upon the expertise of non-fiduciary advisors.

While we would encourage fiduciaries to retain the services of consultants when they need outside assistance to make prudent investments and do not expect fiduciaries to duplicate their advisers' investigative efforts, we believe that ERISA's duty to investigate requires fiduciaries to review the data a consultant

gathers, to assess its significance and to supplement it where necessary. *In re Unisys Savings Plan Litigation,* ("Unisys I"), 74 F.3d 420, 435 (3d Cir.1996). Even with the assistance of outside consultants making up for their lack of investment experience, the Trustees still were required to maintain an independent and critical eye toward the decisions that they approved. *Liss v. Smith,* 991 F.Supp. 278 (S.D.N.Y.1998) (noting that while some circumstances will call for the use of outside investment expertise, "ultimate decision-making authority and responsibility for investments rests with the trustees") (citing *United States v. Mason Tenders Dist. Council,* 909 F.Supp. 882, 886 (S.D.N.Y. 1995)).

The investment making process revealed in the record illustrates an approach wherein Defendants Hegarty and Campbell, along with Mr. Foley, were in total control of the Fund's investments, while the other Defendants passively looked on, moving only to blindly participate when their official approval was called for under the terms of the Trust. At the very least, the Plaintiff here has raised a genuine issue of material fact as to whether the Trustees, for the most part not competent enough to rely on their own expertise, exercised this level of independent scrutiny when approving the Fund's investments.

▆▆▆ The Defendants make much of the fact that they are not accused of any self-dealing, conflict of interest or other inherently wrongful transactions. There is no requirement in ERISA § 404(a)(1)(B), however, that the claimant show that the fiduciary has acted in bad faith. In certain circumstances, the Third Circuit has found that an absence of bad faith by the fiduciary precludes liability. *Burke v. Latrobe Steel Co.,* 775 F.2d 88, 91–92 (3d Cir.1985) (citing *Challenger v. Local Union No. 1,*

619 F.2d 645 (7th Cir.1980)); *Bernatowicz v. Colgate–Palmolive Co.,* 785 F.Supp. 488, 493–94 (D.N.J.1992) *aff'd without opinion,* 981 F.2d 1246 (3d Cir.1992). In these cases, however, the fiduciaries were alleged to have in some way deviated from the fundamental policies of the trust at issue. Under this line of cases, the Third Circuit has held that where a beneficiary has been slighted due to the actions of plan administrators, and those actions are shown to be in conflict with a correct interpretation of the plan provisions, the beneficiary must show bad faith before liability will be imposed under ERISA. *Burke,* 775 F.2d at 91 ("a pensioner does not establish a violation of fiduciary duty simply by showing that the administrator did not follow the terms of the plan.... To establish liability, willful or bad faith conduct must be proved.").

This Court is not presented with such a case. Plaintiff here alleges not that the Defendants failed to accurately interpret the terms of the Trust, but rather that the entire course of conduct embarked upon by the Defendants was ill-informed and imprudent. Similar distinctions have been made previously by other district courts bound to follow *Burke. In re Unisys Corp. Retiree Medical Benefits ERISA Litigation,* 1996 WL 455968 at *3, n. 5 (E.D.Pa.1996) (rejecting the notion that bad faith conduct must be proven under *Burke* in a situation where plan beneficiaries were mislead as to their eligibility for health insurance after retirement). It is not absolutely necessary for the Plaintiff to show bad faith conduct for this Court to impose liability on the Defendants.

### E. *Loss to the Plan*

▆▆▆ This Court remains vigilant of the requirement that even if it were to find that the trustees failed to properly investigate their investments, "it must then de-

termine whether such an evaluation would have disclosed information to the fiduciary prompting her to change her investment strategy." *Olsen v. Hegarty*, No. 99–4642, slip. op. at 11 (D.N.J. July 7, 2000) (Rodriguez, J.) (citing *United States v. Mason Tenders Dist. Council*, 909 F.Supp. 882, 887 (S.D.N.Y.1995)) ("Having found that a trustee has failed to investigate a particular investment adequately ... a court must then examine whether, considering the facts that an adequate and thorough investigation would have revealed, the investment was objectively imprudent.") (other citations omitted). A genuine issue of material fact exists as to whether consideration of the information available to a prudent investor at the time in question would judge the Defendants' actions imprudent.

Further, it is the difference between what actually occurred and what would have occurred under the watch of prudent fiduciaries that establishes what the loss to the plan is. *Donovan v. Bierwirth*, 754 F.2d 1049, 1057 (2d Cir.1985) ("The question of loss to the Plan ... requires a comparison between the actual performance of the Plan and the performance that otherwise would have taken place."). If a prudent fiduciary would have discovered additional information that prompted a different investment course, then the Defendants' claim that the Plan is without loss is consequently without merit.

Plaintiff has offered the report of an expert, Professor Dennis Logue concerning what would have happened had the Trustees consulted expert investment advisors. Cert. of Jerry Tanenbaum, Exh. H ("Pl.'s Expert Report"). This report concludes that advisors would have created scenario analysis specific to the Plan and its goals and explained both the risk and opportunities created by alternative asset allocations. *Id.* at 5. Professor Logue

notes that the United States Department of Labor reported that overall 37% of multi-employer plans' assets were invested in equities. *Id.* at n. 23. Indeed, even the Defendant's own expert testified that it was possible for there to be a breach of fiduciary duty if a defined benefit plan invested all or most of the it's assets into fixed income vehicles, without a sufficient complement of equities. Dep. of William R. Allbright, C.P.A. at 30–33. Taking these factors into consideration, there is a genuine issue of material fact as to what the Trustees's investment strategy would have been, given more extensive research and investigation.

## III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is denied. An appropriate order will enter.